Good morning, and may it please the court, my name is Sean Sweeney. I'm the attorney for the appellant, Emerat AG, whose principals, Ralph Martin and Andrea Bargholtz, are also here in person. We are asking for reversal of dismissal that was granted on summary judgment by the District Court. Emerat AG and WS Packaging, the defendant, entered into a direct contract for Emerat to purchase 25 million cards from WS Packaging in the form of a settlement and escrow agreement entered into in October of 2009. The party specifically agreed that those agreements represented the entirety of their understanding with regard to the purchase of the cards by Emerat with payment to WS Packaging for printing and delivery. Now, Mr. Sweeney, in terms of the 2009 settlement agreement, it's hard to ignore the recital language stating that the agreement is, quote, strictly limited in scope to certain specified disputed items, which conspicuously do not include any security standards. How, if you would tell us, please, how we can simply set aside that express language as to the limited scope of the agreement as your argument, certainly in the briefs, has invited us to do? Yeah, I think the answer to that is, first part, the limited scope provision in that recital that you're discussing says it's the disputed items, capital D, defined term, disputed items, and then the additional matters, also capital A, defined term, additional matters, which really is the references to paragraph 6 of the settlement agreement, which is the paragraph that deals with the payments to be made by Emerat and the delivery to be made by WS Packaging. And even in that paragraph, there's an incorporation of the specifications from the first shipment, but I think the parties did a little bit more than that, which is they also entered into the escrow agreement at the same time, and actually it was just Emerat and WS Packaging who entered into that escrow agreement. And so if we look at that agreement, and you look at the recitals within that agreement, and so if you look at paragraph A of the escrow agreement, it talks about what happened. So we had the settlement agreement that was between the three parties, High Point, Emerat, and WS Packaging. And then you also had this escrow agreement just between Emerat and WS Packaging, and so the parties set forth in those recitals what was taking place. And so in paragraph A, it says there was a settlement agreement that settled the dispute, and then it says, and Emerat is purchasing cards. Then paragraph B of those recitals says that WS Packaging is being compensated for delivering those cards. So then we take it a little bit further, and you go down to paragraph 2 of that escrow agreement, and it again specifically incorporates the specifications from the first shipment, and this time it actually says WS Packaging is to print the cards consistent with those specifications. So then we say, where do we get the specifications for the first shipment? Those are found in the invoice of July 7, 2009 that was sent by WS Packaging to Emerat with the first shipment. So when that first shipment came out, they sent an invoice to Emerat, and incorporated within that invoice is a document called SO41492. It's an internal sort of document at WS Packaging that sets forth all sorts of specifications, including in big bold capital letters, there can be no candling. If the court is looking for that in the record, it's 59-20, ECF number 59-20 is that particular specification sheet that was incorporated in those, in that invoice. So we take it a little bit further. I'm sort of lost at this point, but okay. What I'm wondering is, if the settlement agreement were intended to replace or supersede the preexisting contract between High Point and WS Packaging, wouldn't we expect to see explicit production standards in the settlement agreement, especially given the security flaws in the previous runs of cards? I mean, this is really, you know, well, go ahead. Well I think it's just the opposite, that the parties chose to simply reference the prior specifications, and they do so very specifically in both the settlement agreement and the escrow agreement, saying you're going to print them exactly to the same specifications as you already sent the cards. And so I don't think they were obligated to go and print that out and put it in the agreement in order to have something that is an agreement that says this is what you're selling. And I think it's the integration clauses that sort of settle that for us, as they said, if we look at the escrow agreement, and we're defining what happened between the parties, and we're saying this is the entirety of the agreement between MRAT and WS Packaging for the purchase of cards, the payment of WS Packaging, and the delivery of those cards. And they say there's nothing else outside of these agreements that governs that particular transaction that they're trying to memorialize here in these agreements. Well that's the universe of the agreement, then if WS Packaging delivers defective cards, then they're in breach of that agreement. Now ultimately, as the district court pointed out, there may be an issue of fact for the jury to decide whether or not the cards were defective, or what exactly the security standards were, but it doesn't mean that WS Packaging gets to incorporate terms and conditions from a prior agreement with a different entity, with High Point, to limit the claims of MRAT for breach of this agreement that's before us. Mr. Sweeney, could I direct your attention to paragraph 5 in the settlement agreement? Yes. And specifically to the final paragraph in that provision. I have to say, the way this is documented, it's a little odd, where the settlement agreement becomes the contract, and the provision on numbering of cards looks like an obligation to supply cards, but in this last paragraph there, it begins, in their sole discretion, MRAT and High Point may at any time give WSPG permission to ship less than 25 million cards to MRAT, and if such permission is given, MRAT and High Point agree WSPG will have no liability for the card shortfall. I read that as implying, fairly clearly, that if MRAT and High Point don't give that permission, then WSPG has an obligation to ship the 25 million cards. Is that how you read it? Yes, I think that's right. It's certainly how I read it. Okay. Then could I ask you, we've been told by WS in its brief that your client canceled the third and fourth shipments that were covered by these documents. Can you give us some guidance, including where it is in the record, as to what happened to the second, third, and fourth shipments that were contemplated? The shipment numbers, I'll start from the beginning, are a little confusing because there was really a first, first shipment that was in 2008 that everybody kind of agreed was defective, and so the terminology in the settlement agreement really starts in July of 2009 as the first shipment. That shipment shows up and has the sequencing issues that gave rise to the dispute. Then the second shipment shows up in October of 2009, and that's the ones in which we claim are defective, and MRAT notified- But those were delivered to you. They were delivered to Dubai, and they were discovered to be defective at that point when they were able to be candled. When WS Packaging went back to MRAT, or strike that, MRAT went back to WS Packaging and said they're defective, WS Packaging refused to move forward. You asked me where in the record that is. I believe it's in the plaintiff's statement of facts. It's either that or in the joint stipulated facts. I don't recall as I stand here now. But in the summary judgment papers, that was- Yes, it was in the summary judgment papers that that was a series of events. So then when no further shipments, when the shipment arrived and was defective, the next obligation was for MRAT to deposit funds into the escrow account to trigger the obligation to send the third shipment. Well since we had defective cards that WS Packaging would not replace, that never happened and it never went forward from that point on. So that's where things crashed, okay. So if we go back to what it is that WS Packaging is arguing and this limited scope provision that Your Honor was asking me about, is what they're really saying is that this recital and the settlement agreement that says that the transaction is limited in scope to these that trumps the recital in the escrow agreement that says that these, this transaction or the documents involved in this transaction govern both settling the dispute and the purchase of cards by MRAT and the sale or delivery and payment to WS Packaging. That's not the law and that can't be the case and it's in part because the recitals within the settlement agreement were never incorporated into the document, whereas the recitals in the escrow agreement were specifically incorporated by paragraph 5 of the escrow agreement to be substantive provisions. And so I still read the settlement agreement restriction to be consistent with our argument, which is that the additional matters are still an obligation by WS Packaging to deliver non-defective cards. However, WS Packaging's argument fails either way because if it's in conflict with the recitals in the escrow agreement that are incorporated, the incorporated, now substantive, provisions control. They trump those provisions. And that's what it comes down to. I think there ended up being a lot of discussion, both at summary judgment and in the briefing, about whether this was a manufacturing contract or a delivery contract, and I have never really understood that distinction made by WS Packaging because I think the law in Wisconsin still says that if you're delivering a specific goods and you know that there's a specific purpose, there's an implied warranty that they'll be fit for the particular purpose. And it's up to WS Packaging to disclaim any kind of implied warranty under the law. And that never happened because instead they said these agreements constitute the entirety of their understanding. And so if I was ordering coffee mugs, implicit is that they won't leak, they hold liquid. If I'm ordering scratch cards, implicit is that they're secure, you can't read underneath the scratch layer with a flashlight. And now in this case it was also explicit promises that they would be secure and couldn't be candled, as the industry term is. And so this idea that despite the parties putting into their agreements very specific provisions about what it is that governs their agreement, that WS Packaging wants to bring in limitations that MRAT never negotiated, wasn't a part of, didn't know about, and was never referenced in these agreements, the escrow and settlement agreements, which of course they easily could have said these are the terms and conditions to this deal. None of that happened until incorporate those into this agreement and impose those limitations on MRAT, isn't consistent with the agreements that the parties entered into. The last part of it is that I think even if the court gets to that point in which they make a determination that the letter of indemnification with high point does actually impose terms on to this transaction between MRAT and WS Packaging, I think that statute of limitations was misapplied. And if there was very specific language that gave two conditions precedent in which they would trigger this shortened statute of limitations, one is completion of the services, which certainly never happened, and the other was delivery of the products. There was never a dispute that this was always a 25 million card order, they never delivered the 25 million cards. That condition precedent that WS Packaging had put in its letter of indemnification with high point was never reached, and therefore even if that did apply, that shortened statute of limitations was never triggered. When were those letters of indemnification? It was two different ones. One was in May of 2008, the other was April of 2009. They're kind of generic agreements that say... But that's back before the settlement agreement, back when you've got, in essence, three parties in a line, and your party was not dealing directly with WS at that point. Correct, at that point. Correct. So the appellant asks that the court reverse the district court on its granting of summary judgment and allow MRAT to be remanded back to the court for trial. Thank you. Thank you, Mr. Sweeney. Mr. Temple. Good morning. May it please the court, my name is Guy Temple. I represent the appellee WS Packaging group. The appellant has made one point in their briefing, the case before this court, that we would agree with, and that is that it is, in fact, a straightforward contract claim. Unfortunately, their contract is not with my client, WS Packaging. Now the district... Before October 2009, that's clear. And obviously, there was a lot of distraction in the case from attempts pre-settlement agreement to overcome that problem before the settlement agreement. But with the settlement agreement, you've got a direct contract between your client and MRAT, right? There is a direct contract between MRAT and WS Packaging and High Point, the three parties together in the settlement agreement. The question is whether or not that replaced and completely unwound the previous contracts. And looking at the settlement agreement, there's no indication within the terms of the settlement agreement that the parties intended to completely unwind those previous contracts. What do you mean unwind? You have purchase orders from MRAT to High Point, May of 2008 for these cards. You have High Point turning to WS Packaging and issuing purchase orders for the cards in 2008 and again in 2009. With carefully negotiated terms within the letters of indemnification that became part of those contracts between High Point and WS Packaging. And then you have a settlement agreement that on its very first page is very specific, that it is limited in scope. So here the parties have been dealing for some time. Right, but it does have paragraphs five and six, okay? Perhaps you could address the point concerning the escrow agreement imposing an obligation and what's implicit in paragraph five, that your client is agreeing to supply 25 million cards directly to MRAT. I think if you read paragraph five, the last section five, the last paragraph there that you referenced, that High Point and MRAT may provide WS Packaging permission to ship less than 25 million cards. If you read that in conjunction with the very first recital of the settlement agreement, which is that WS Packaging agreed to sell to High Point 25 million cards, the parties up front note the fact that they have these direct contracts, WS Packaging to High Point, High Point to MRAT. And so later... That was the old days, right? But then the settlement agreement seems to change everything because MRAT, at least as I read that paragraph at the end of section five, can say, no, we don't give you permission to have a shortfall, therefore there's an implicit, but I think fairly clear, obligation to deliver 25 million cards. So what am I missing? The fact that MRAT... Excuse me, Your Honor. What am I missing? The fact that MRAT could grant permission to ship less than 25 million cards... Or deny permission. Or deny permission. It doesn't change the fact that WS Packaging's obligation and contract was to High Point to ship those cards. Now, MRAT is the end customer. MRAT is the one that is dealing then, in fact, with their end customer, Sabafon, a telecommunications company in Dubai. They're dealing with the end customer and are aware of perhaps any reasons why they might want less than 25 million cards. I think that last paragraph of section five contemplates that MRAT had some control over dictating shipment of less than 25 million cards because they were the ones dealing with the end user in the Middle East. But WS Packaging's agreement is to ship cards to High Point. And I think if you look at the limited scope, what MRAT... The theory they advance is that the parties intended to create an entirely new contract, but expressed that by saying, this settlement agreement is limited in scope to a dispute and a few additional matters. If you accept that argument, the parties somehow memorialize their brand new contract by calling it additional matters. The idea that the parties, having dealt together for a year and a half, reach a settlement on a few issues in dispute, and then decide to create an entirely new direct contract, cut out the broker, and memorialize that by limiting the scope of the settlement agreement, and then putting that new contract into a paragraph of something titled additional matters. Which if you look at those additional matters, it references the numbering of the cards in paragraph five. The reason that that $25 million card shortfall was significant was because that paragraph five addresses the manner in which the cards would be numbered. That was part of the issue that had arisen, was sequencing the cards, the way that the cards were serial numbered when they were delivered in boxes, so that the serial numbers could be checked against a database of serial numbers. And so section five talks about numbering and then finishes with WS Packaging can ship less than $25 million if the end customer or High Point directs them to do so. And then paragraph six, which MRAT heavily relies on as creating some kind of new contract, simply discusses the sequencing of shipment, and then provides for a method of payment. The contract remains with High Point. The parties had the opportunity. So is it your contention then that all these provisions left entirely in your client's discretion, whether to manufacture cards, what standards there would be, or what? Absolutely not. They were to manufacture cards in accordance with their contract with High Point Printing, which was memorialized in a quote, two quotes that were issued in 2008 and 2009, followed by purchase orders in 2008 and 2009. But Mr. Temple, there are references in the escrow agreement to the standards used to manufacture the so-called first shipment of cards. Why wouldn't that suggest that the settlement and escrow agreements, in fact, did incorporate production standards, including security standards? The escrow agreement references the specifications, but actually the, I think if you read those in their entirety, the purpose of that reference in both the settlement agreement and the escrow agreement is that MRAT now has the ability to, and the requirement, the obligation is on MRAT to provide some form of certification before those additional shipments are released. One of the things that is noted in the party's joint stipulation of facts is that MRAT directed these cards to be submitted for testing prior to shipment, and so WS Packaging in this settlement agreement just said, okay, end customer of High Points, you need to give us the authority to ship these. Before we ship them, you have the obligation to say that they're good to be shipped. But the idea that that somehow provides the new contract terms, it's incorporating those standards that are in the party's original contracts, which are referenced up front in the settlement agreement. And the escrow agreement, going to the integration clause, which counsel for the appellant referenced in the escrow agreement, just like the settlement agreement, it says that it is the entire understanding of the parties with respect to the matters therein. The settlement agreement lays out its express scope, which is the disputed items and some additional matters. And then the escrow agreement within its scope is to provide a form of releasing funds, presumably because MRAT wished to have the funds delivered directly to WS Packaging instead of continuing to go through their broker. Well, you know, the recitals in the settlement agreement were not expressly incorporated into the agreement. By contrast, the recitals in the escrow agreement were. So what do we make of that difference in terms of the weight we should give to the recital provisions in the settlement agreement? With respect to the recital provisions in the settlement agreement, I understand the case law on weighing operative provisions over recitals when there is some form of conflict. And I know the appellant has raised this issue. But read together, as contract principles would require, there is no conflict between the recitals in the settlement agreement and the remainder of the settlement agreement. The recitals lay out the scope and then the additional matters, and there's nothing in the remainder of the settlement agreement to say that that scope is not actually appropriate. In fact, read together, a reasonable interpretation is that the settlement agreement was the party's agreement to resolve these few matters and then to set up a new schedule for shipment of the cards. The parties ceased shipment briefly while they negotiated the settlement to make sure that they had the sequencing and the numbering issues resolved, and then they had to set a new schedule by which the cards would be shipped. But again, I would state that the one time that all the parties signed on to an agreement together, High Point, WS Packaging, and MRAT, there is an opportunity for them to spell out if High Point is out of the picture, if the contract is now directly between WS Packaging and MRAT. And I think the theory that MRAT advances is that there was a new contract created inadvertently by the settlement agreement, and I don't think that you can read a reasonable interpretation of the settlement agreement to have any intentional creation of some new contract. So going back to the relationship of the parties, I think it's important to note that the reason that we are here is because High Point, the party with whom both sides contracted, is dissolved. They're out of business in 2013. The contract was between MRAT and High Point, between High Point and WS Packaging. This is MRAT trying to fit in some sort of breach of contract claim because they are not able to pursue recovery from High Point. But as the district court noted, the settlement agreement is clear in its terms that the parties intended to limit its scope. Now, the next argument that MRAT makes in the alternative is a third-party beneficiary argument, and they note that they are a beneficiary, then, of the contract between WS Packaging and High Point. I don't know that you need to spend a lot of time on that. Fair enough, Your Honor. At least for my purposes. Sure. Well, I will briefly address, then, the breach of warranty claim as well that MRAT asked for review of. The warranty claim that they brought forth was dismissed for the same reasons that the settlement agreement claim for breach of contract cannot survive, and the third-party beneficiary claim cannot, the breach of warranty claim cannot. There is no warranty within the settlement agreement between WS Packaging and MRAT where it's not a contract for the manufacturing of the cards, and to the extent that MRAT claims any warranty stemming from its role as a third-party beneficiary, that warranty is time-barred by the letters of indemnification between WS Packaging and High Point because MRAT stands in High Point's shoes. The last point that they discuss in their briefing, and it came up in the district court's opinion, and I want to touch on this, is this notion of a unilateral contract existing between WS Packaging and MRAT. This was not a claim that was ever pled by MRAT in either their initial complaint or in the amended complaint, but it is something that they raised for the first time in summary judgment briefing, and so the district court addressed that claim. The argument is that somehow a few statements made by WS Packaging regarding its abilities to perform the job created a unilateral contract, despite the fact that there were still direct contracts between MRAT and High Point and between High Point and WS Packaging. And MRAT relies first on the Paulson case in the Wisconsin Supreme Court for this provision. What's clear in Paulson is that the court noted a very specific factual representation from a manufacturer to the customer. In that case, the specific representation was, I believe, regarding the capacity of a—I'm sorry, I don't have that in front of me here—but the capacity of a particular tool, excuse me, a grain bin, that it would dry their harvest of 5,000 bushels of corn within 24 hours. Likewise, the Timberland case that MRAT relies on involved very specific representations regarding the tonnage and hauling capacity of a locomotive. In contrast here, in order to support a claim for a unilateral contract, MRAT cites statements from WS Packaging that they could, quote, do the job, and that they could do the job better than a previous printer that MRAT had used in Chile. The district court properly concluded that no reasonable jury could find that a unilateral contract existed based simply on those statements, particularly given that there's no reference to those representations in the purchase orders from MRAT to High Point. And then, you know, the focus of MRAT's briefing is on disputes of fact related to direct contacts between the parties, but I would point back again to the settlement agreement. When the parties came together and spelled out where they stood, they had the opportunity to note that the relationships had changed or that there was now a direct contract between customer and manufacturer, and they did the exact opposite. The language of the settlement agreement in putting the limitation of scope on the very first page makes clear that the parties intended to resolve a limited issue. The notion that somehow the direct communications between a customer here and a manufacturer or the, you know, the language of the settlement agreement regarding timing of deliveries replaced entirely the parties' earlier contracts just does not comport to the language of the settlement agreement that they wanted to limit the scope. Mr. Temple, would you agree that prior to the settlement agreement, if your client had shipped conforming cards and did not get paid, that you could look only to High Point for payment? My client's contract was with High Point, and yes. And then what about after the settlement agreement, though? Now you've got, you're bypassing High Point and agreeing we'll handle payments through the bank as the escrow agent, right? Correct. So you're going to get paid that way, right? Right. By money that Emeraught deposits with the escrow. Correct. Okay. And again, there are specific obligations in the settlement agreement, and the deposit of money in the escrow account is one of those. What are the specific obligations that your client has under the settlement agreement? So under the settlement agreement, WS Packaging was required to issue a credit to High Point, and I think it's very notable that that credit was going to High Point and not to Emeraught for $275,000. There is no argument that that credit was not properly issued. And then there is a specific obligation that no two cards be printed with the same serial number. That is the obligation in Section 5 of the settlement agreement. Is there an obligation to print cards? That is an obligation to make sure that the cards are properly numbered. But again, the printing contract, as the settlement agreement notes, is between WS Packaging and High Point. And I think it's important to note here, WS Packaging went to great pains to negotiate the terms and conditions of this job with High Point. WS Packaging is in the printing business. They understood the nature of this kind of contract, and so when they enter into a contract with High Point, they had High Point agree to these letters of indemnification that spelled out the party's obligations and conditions of the game orders. And they did that twice, and High Point signed off on those. The argument that somehow, you know, Emmerich standing in High Point's shoes shouldn't have to accept those is picking and choosing there. There's no dispute as far as the battle of the forms. There was a clear negotiated set of terms between WS Packaging and High Point. And now Emmerich argues somehow that WS Packaging did away with all of that in the settlement agreement and created an entirely new contract just in that additional matters section. And I think their argument is really that a contract was created inadvertently by the language, and that's not an argument they can evade. Counsel, I had understood the argument a little differently, which was, in essence, rather than an accidental contract, that these documents essentially reflect what was understood between the parties, which was that High Point was going to drop out, but that the obligations would run directly between WS and Emmerich to finish the deal. And yet there's no language within there that High Point is dropping out. There is reference to WS Packaging issuing credits directly to High Point. There's notation that the contract is between WS Packaging and High Point in the very first paragraph of the recitals. Again, if the parties had intended for this to completely unwind previous contracts, they certainly had the opportunity to do so. The language indicates an intention to do otherwise. And that's reflected in the limited scope. Nothing further. Thank you. Thank you. Thank you. Thank you, Mr. Temple. Anything further, Mr. Sweeney? Yes, Your Honor. Mr. Temple's disbelief about how they would have entered this or why, I think, is the only evidence of issues of fact that may ultimately be what the jury will decide. But Emmerich was trying to get 25 million cards, and I think the Court has it exactly right that the documents suggest that High Point was stepping out. And I noticed that WS Packaging ignores the escrow agreement entirely in its brief. If you look at page 15 of its response brief, it kind of talks about how we say that the entire agreement is between those two agreements, but then immediately ignores the language in the escrow agreement and just goes back to arguing the language in the settlement agreement. But if you look at it, you've got High Point, who, as the middleman, had paid some money back in 08 to WS Packaging. So if they're going to be out, what do you have to do? You have to give some credit in some way. So WS Packaging gives that credit to High Point. High Point, in turn, gives the credit to Emmerich. And that's it. That's the end of High Point's obligations under these agreements. There's none further. Now, Emmerich, with its credit, has a new payment schedule and is ordering these cards from WS Packaging. And then that's reflected in the escrow agreement. And so when Mr. Temple was asked, you know, what are the obligations of WS Packaging, he never got to the final obligation, which was to print cards consistent with the specifications from the first shipment and deliver them to Emmerich on a schedule in exchange for money. That's how we contract for buying stuff. And that's what they've done. And so if you look at paragraph 2A of the escrow agreement, Mr. Temple characterized that as saying it was only Emmerich's obligations to inspect the cards to see if they were consistent with the specifications. Now, that is what the settlement agreement says, but it's not what the escrow agreement says. The escrow agreement says under 2A sub I, if I can find it, is that WS Packaging notifies Emmerich that the third shipment of cards is completed consistent with the product specifications used to manufacture the first shipment of cards. That's WS Packaging's obligation to say, hey guys, they're ready. We printed them, we did them consistent with those specifications, they're ready to go. Then it would trigger the obligation for Emmerich to put money in the escrow agreement so WS Packaging can be paid for those cards. And if we look at the integration clause in paragraph 5 of the escrow agreement, it says this agreement together with the settlement agreement and schedule 1. So you had the settlement agreement that's set out in the recitals, hey, this is what happened in the past, now High Point's giving its credit to Emmerich, and here's some of the disputed matters, the additional matters. And then they sign the escrow agreement that says, and here we're saying this settlement agreement over here and the escrow agreement, and it goes back to the quote, is intended as a complete statement of all the terms and arrangements among the parties with respect to the matters provided for and supersedes any previous understandings. So then we say, what are the matters provided for? Go back to the incorporated recitals, and it's paragraph A, the matters provided for are that WS Packaging, Emmerich, and High Point are among other commitments, parties to a settlement agreement, and an important word, and the purchase by Emmerich of certain scratch and reveal cards. And then B is payment to WS Packaging and delivery of the cards. And so they've said, we had a settlement agreement, they had the three, we also have this purchase of the cards by Emmerich and the delivery by WS Packaging, they have to be done to the specifications of the first shipment, and they didn't do it. They breached when they sent us defective cards, and Emmerich is entitled to have it stay in court. What they're actually seeking to do is to say that the parties intended to amend the agreements between High Point and WS Packaging with the settlement agreement. So that's what they argue in the brief, and that's what the district court found. But that's not supported by the language of the documents. And there's nowhere, nothing in the record that WS Packaging cites to that there was any intent to amend those agreements by these agreements or incorporate terms and conditions from that indemnification letter with High Point, which WS Packaging testified and is part of the, our statement of facts was generic. Thank you, Counsel. Thank you. The case is taken under advisement.